The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. The first case for argument this morning is 19-1837, Finjan v. Juniper Networks. Ms. Brooks, now we're ready to hear you proceed. Have you proceed. Thank you. Thank you very much, Your Honor. For my apologies, this is the first time that I have done one of these, certainly not my first circuit argument, but certainly the first time I have proceeded here. I am trying to picture all of your honors and pretend that I'm standing there before you. This particular argument will be very brief. It was not opposed by Juniper, so there was no opposing brief filed. And the only reason that we took this issue up on appeal is that we had essentially had to express instructions from Judge Alsup at the district court level that if we wanted certain portions of the Daubert ruling, very small portions, to remain sealed, then we had to appeal the order or it would automatically become unsealed, or we had to appeal the issue of sealing. Ms. Brooks, this is Judge Prost. Let me just ask you, I know where we can... We've got a case in Uniloc, which seems very similar to this. And in that case, also with Judge Alsup, we remanded the case for him to make findings and analyze this question. You're asking for a reversal, but even if we agreed with you, wouldn't a remand rather than a reversal be at the appropriate course? Yes, Your Honor. I think it would. Thank you. Okay, Ms. Brooks, this is Judge Wallach. Did the judge indicate why he didn't want those particular numbers, why he wanted them made public? No, unfortunately, he did not. It was simply a broad, unless you... We articulated why we did want them to not be public. They are specific licensing numbers for Finjen that the public should have particularly no interest in, but Finjen certainly has interest in keeping them confidential. And Judge Alsup did not articulate why he felt that was inappropriate. Okay, thanks. And with that, I would submit. Thank you very much. The case is submitted. We can move on to the next case now, Christina, whenever you're ready. Thank you, Chief Judge Prost. The court will pause momentarily to set up the next argument. Next case for argument is 19-2405, Finjen, Inc. v. Juniper Networks. Ms. Brooks. Thank you, Your Honor. I now feel like a very experienced advocate. My second argument over the telephone. May it please the court. Your Honor, this, as you can see, is a very lengthy brief with five issues. And I only have... This is Judge Walla. Yes, Your Honor. You're never going to have an easier one than the last one. This is harder. On page 70 of the blue brief, maybe you can clear this up for me. You say the district court wrongly reasoned that only by sending a complete infringement claim chart could Finjen establish actual notice. Where in the summary judgment order did the district court conclude you were required to but did not supply a claim chart? I know identify a specific patent, but I don't think that's the same thing. What the court said, Your Honor, and it's in Appendix 18690 at lines 10 through 15. This is actually what the court said, which is that Finjen was, quote, going to lose the issue absent presenting, quote, a claim chart, unquote, that, quote, showed the 780 patent that was essentially. So that's our position that the court was essentially saying that we needed that. There's also inferences, Your Honor, that that's what the court was saying because if you looked at the dialogue back and forth between Finjen and Syforth, it went on for months. We had even gotten to the point where we had exchanged a term sheet. This was by mid-2016, I believe it was. My office has just gone dark, so I can't see my notes. There was even a term sheet exchanged. And during that time, the patents in the case were discussed. The 154 was discussed. The 454 was discussed. And the 780 was actually part of a presentation. So one could infer that if all of that was not... And we identified the infringing device, this ATP. So if all of that was not enough for actual notice, and Judge Alsup saying from the bench that we were going to lose, because this was in the form, once again, of a summary judgment, which is interesting because compliance with notice is a fact issue. And yet what the lower court found is that despite the fact that we'd engaged in these lengthy discussions with Syforth, despite the fact that we had told them what the accused product was, despite the fact that we have identified pertinent patents absent, according to him, a claim chart that showed the 780 patent was violated, we would not meet in his mind, as a matter of law, apparently, our requirement to show notice, actual notice. Okay. That's very helpful. Thank you. Thank you, Your Honor. And Judge Stoll, wasn't that just a statement from the bench at oral argument? I don't think there was any reference to a claim chart in the actual written order from Judge Alsup. Isn't that true? That is true, Your Honor, but what Judge Alsup did find in the written order, so we could go, for example, to Appendix 96, it is part of Judge Alsup's written order on this issue. He talks about how Finjen is attempting to cobble together notice, and that even though there was a draft license agreement, and that the draft license agreement discussed specific patent rights, and that the 780 patent was called out in the presentation, he lists all of that. He says that we needed to, and I'm trying to get his actual wording here, that since we were able to, because we did do one chart on a different patent, since we were able to do that, then we should have done it here. I'm sorry, I just, I don't see that, so could you show me what sentence you're relying on for that? Yes, I will, Your Honor. I mean, it's more of an inference, but I just, I want to know what sentence you're relying on. Yes, Your Honor, give me one second to get there, and I will find it. It's in his order, but, and actually, the bottom line, Your Honor, is we're talking here about a summary judgment, so it isn't as if this factual dispute went before the jury. Can I ask you something else? Yes, Your Honor. Which is, I think that in that presentation you were referring to, the patent that we're talking about here was one of 17 patents that was listed in that presentation. You know, I might be off by one or two, but when I, by my count, it was 17, so your point is that even though it was one of 17, a reasonable jury could have thought that that was noticed. Yes, Your Honor, but actually, I think I have found, if I can now go back to Appendix 96, I think I have found where the line is. It should be at the bottom of the page. But that's about- The third line from the bottom on Appendix 96. It says, this order finds Finjen's argument particularly unpersuasive, where Finjen was perfectly capable of calling out other patents. Yes, Your Honor, that's exactly the language I'm talking about. I thought that that went to the fact that this was one of 17 patents that was identified in the presentation. Well, actually, the way it was identified, the way the 780 was identified in the presentation was actually only among three or four other patents where Finjen identified those patents as having been successfully litigated in the past, specifically referencing Blue Coat, for example, and identified- But if you look at the page you're referring to, there's other patents identified. Yes, that was, there was a bunch of different patents identified further down on the page. I don't remember exactly what page number that was in the appendix, but I didn't see anything where that one box was called out any more than any other box listing other patents, and the total number of patents presented in the presentation was, like I said, it was one of 17. In the presentation, it was one of 17. In that particular box, and I'm trying to find it, Your Honor, I believe it was only one of- Here we are. It was in the, as far as it, so this is going to be in our blue brief at page 69. We show the actual presentation. We have it embedded there. It talks about the Blue Coat litigation, and there's only three patents that are listed, the 780 being right there in the middle of them. It talks about the secure litigation, and there are one, two, three, four, five patents- But you have only put a certain part of this page in. This is a cropped part of the page. That was true. I agree. I'm sorry. If you look at the record, I believe there were other patents that were cited on that page. I'm- Maybe I'm misunderstanding, but when I looked at the page in the record, the presentation, there were other patents that were cited. I don't believe so, Your Honor. If we look at Appendix 16234- I see. I was looking at then the next page, 16235. Yes. If you look at 16234 with 16235, it's one of 17 pages, and this presentation was provided together, right? Or do you think there should be some inference that the 780 should be specifically called out because it's in a particular box? I certainly think the 780 is highlighted. When you look at this page, it does stand out as far as having been asserted in both these successful litigations, and then when you go to the next page, there are more patents listed as to what is planned for future litigations. But really, the issue here is the procedural posture. Perhaps this isn't sufficient, but not as a matter of law. It's as a matter of fact, whether or not with what clearly, it's not like Cyport wasn't on notice, that we believe they were infringing. We as we say, we engaged in lengthy discussions with Cyport over the course of many months, and even got to the point in July where we were exchanging a term sheet, where they were going to be taking a license to all of the applicable patents in Finch's portfolio. And so, it's a question of fact for a jury to decide under, you know, of course the court will instruct them as to what the law is, and whether or not that was sufficient to put Cyport, which was then acquired by Juniper. It would be a different posture if we had had a jury verdict of no notice, insufficient notice, but here we had summary judgment, and where it's a question of fact. I understand your point. I have a question for you, though, on that very point, which is, was there any declaration of a fact witness who was present at these negotiations, who like with a declaration provided to the district court, so the district court would see more than just these two documents, but would have a witness explaining what was discussed during those negotiations? Because I presume what you're saying is that you would have presented that kind of testimony to a jury. But did the judge get to see what kind of testimony you were relying on to say that there was a genuine issue of material fact? We never got that far, Your Honor, because what the judge had was, for example, if you look at Appendix 16225, this is the beginning of the discussion with Cyport. This is in January now of 2016, where we specifically accused ATP. And so, it's a letter. It's as good, I guess, as a declaration of somebody saying, hello, we're Finch's, Cyport, we're accusing your ATP advance, which is your advanced persistent threat, as infringing. And then we gave, as what we said was a representative example, the 305, and actually did a claim chart where we charted it out. We also then listed the 494, which was at issue in this case, and the 154. And I believe I heard my tone, so I think my time is up. But of course, I will continue to answer any questions the court might have. Well, I appreciate that. Oddly, as you noted at the outset, you have, I guess, five issues here, and you really haven't gotten to discuss those. But obviously, the briefing is comprehensive, and we can easily rely on the briefs for those other issues. So, thank you. We'll reserve the remainder of your rebuttal. And let's hear from your friend on the other side. Thank you, Your Honor. Mr. Kagan. Thank you, Your Honor. May it please the Court, Jonathan Kagan of Irela, Manila, representing Juniper Networks. So, let me just start with discussing the notice issues on the 780. As Your Honor noted, or as was mentioned by counsel, there was no declaration. So, the notice issue with the 780 is something that this court has the full record upon which Finjian relied. But let me interrupt. This is Judge Prost, Mr. Kagan. But why isn't Ms. Brooks right that this ultimately should have been a question for the jury? I mean, whether it's—the issue is whether or not it was sufficiently specific to support an objective understanding that the recipient may be an infringer. Why isn't that a jury question? I mean, there were documents. It's not like they just said, we did it, and end of story. There were documents in the record. Why isn't that really feel like a jury question and not one for the judge to decide on summary judgment? So, with notice, there are two issues that need to be identified to establish notice. One is the identification of a product. And the other is the identification of a specific patent that one believes is being infringed. So, the question—the question is not, did Finjian identify the 780 patent as a patent in its portfolio, or did it identify it as a patent against which other people who make different products may infringe? The question is, did Finjian ever advance or put a CIFOR on notice that it believed a CIFOR product was infringing the 780 patent? And when you look at the presentation and the pages that were being discussed earlier, what you saw was that Finjian was not—it mentioned the 780 patent, but not as a patent that it believed CIFOR had infringed, but as a patent that it believed other companies, some other companies had infringed, or that it had success against those other companies in obtaining licenses. So, in the—on Appendix 16234 and 16235, for example, it showed that it believed Blue Cure and Sophos were either infringing or had been found to infringe that patent. On the other hand, for Proofpoint, which is also listed, it doesn't show the 780 patent. So, what this presentation says is different—and there's different patents. There's different patents of—in our portfolio, we believe have been infringed by different ones of your competitors. That's not noticed to CIFOR that it believes one of the CIFOR products is infringing that patent. And what we do is we actually have a letter, and this is Appendix 16225 through 16227, and this is the letter that Finjian sends to CIFOR, and it says, these are the patents that we think are the relevant ones, and it identifies four patents. None of those patents are the 780 patents. So, the question is, is there something in that record where Finjian is putting CIFOR on notice that it believes that CIFOR is infringing the 780 patent? And there was nothing there, and I think the reason there was such a long colloquy with Judge Alsup at the hearing on this is Finjian kept saying, yes, we did provide specific notice about the 780 patent, and Judge Alsup kept saying, where? You've done claim charts for these other patents. You put them on notice. Show me where you say that you believe CIFOR infringes the 780 patent, and there was no evidence of that, and so that is why it's appropriate for summary judgment. There are no further questions on notice. There's another issue with the 780 patent as well that relates to claim construction. I have a separate question for you, counsel. This is Judge Wallach. On page 29 of the gray brief addressing the district court's conclusion that Finjian's expert testimony on damages was premised on an untimely infringement theory, Finjian asserts that you and the district court were incorrect because, quote, Juniper was not selling SRX gateways alone. Juniper was selling SRX gateways in combination with free access to Sky ATP. By selling the combination, Juniper was selling the patented system. Is there any merit to that argument? There's not, and the reason is as follows. While there was a free license that was granted to all purchasers of SRX systems, the SRX systems as sold could not operate with Sky ATP. So they were incompatible with operation with Sky ATP unless they were first modified. And so in order to modify the system, users could take advantage of a free license or purchase a license. But then what they would have to do is download a software script that Juniper created. And what that software script does is it modified the SRX device that they bought so that it then could be combined with the Sky ATP system. So what was sold essentially was not a complete system that could be used, but it's a system that could be modified if a user chose to be used together. And in the Juniper damages model, we included all sales of all modified systems. So every system that was sold that could have been combined with Sky ATP, every SRX that could have been combined with Sky ATP was included in our calculation, but that was only 300 systems. And the problem with FinGen's damages calculation is it included all SRX systems, whether or not they had been modified so that they could be combined with Sky ATP. And even more egregiously, they included SRX systems that were actually incompatible, that could not be modified to operate with an SRX. And they included sales of those systems in their damages calculation. So is your position that only those that could be modified should have been included and those that could not be should be? Shouldn't be? Where do you draw the line? So this is an expired patent. And we have a start date for when the Sky ATP system existed. So we know, so it's a closed universe. We have a closed period of time. So we know exactly how many systems had been modified and were capable, how many SRX systems were even capable of being combined with Sky ATP. We included every system that was sold that was capable, because it was capable of being modified and it had been modified. So if a system had been sold during that period of time that was not capable of connecting, either because it didn't have the right hardware or because it had never been modified through the download and operation of software, those systems we excluded. We don't know how many systems were actually combined, but we took every single system that could physically have been combined during the relevant time period. Those were all included in our damages calculation. And again, the problem with Finchins is they included systems that were incapable, either for hardware reasons or for software reasons, of being combined. And that's why they changed their theory. That's where Finchins said, when it came time to submit their damages report, they said, we're including sales of all SRX, even though we had only previously accused Sky ATP by itself and Sky ATP in combination with SRX. And Finchins' infringement expert had said, it's not the SRX by itself that infringes. And then their damages expert takes a different position. So that's why the judge found a waiver. And that is, and this is where we believe that is subject to an abusive discretion review, because this is a question of whether Finchins waived that argument. It's not a, the judge did not actually reach the details of Finchins' infringement theory, which is defective for reasons that I can explain. But the judge didn't get to that point because he found that Finchins had waived, and that is subject to an abusive discretion review. So if there, I can turn to the infringement issues now relating to the 780 patent, unless there are any further questions on. So with the 780 patent then, there's a clear dispute between the parties over whether, over the number of hashes that the parties have to deal with. Over the number that are required, but it's sort of a fake dispute. What Finchins claims is that, well, the purpose of this patent is to identify products and malware that is potentially coming into a system that may try to disguise themselves by having certain components removed and downloaded separately at a later period in time. And the way that the patent describes getting around this problem is by performing a hash function on the downloadable, which is the main program, together with the fetched components. And when you perform a hash function on that, you generate, you will generate a particular unique identification number, like a fingerprint for that file. What hackers would do, according to Finchins, is sometimes they would take some of the components outside of the downloadable. Because then when the downloadable comes in and it's hashed, it's going to have a different value than the complete combined hash, so it will slip through. And later on, it will get the fetched component. So the whole purpose of Finchins' invention is that you take the fetched components, you grab them, and you perform the hash on it together. And this is what they said in the prosecution history. They explained that this is exactly what happens, and this is why their invention works. This is an appendix 4253, where they say the same downloadable may be delivered with some required software components included and others missing. And in each case, the generated downloadable ID will be the same in their invention. The reason is because, this is a little bit further up on the page, still 4253, is that the present invention produces the same ID for a downloadable, regardless of which software components are included with the downloadable and which software components are only referenced. So that is their statement in the prosecution history, and that is what this court relied on, and it's also what the Blue Coat Court relied on. So Finchins cites to Judge Freeman's opinion in the Blue Coat case of supporting their position. And I would invite this court to read that opinion. I'm not going to read it here, but she squarely rejects Finchins' view of this patent. And says that you need to generate a unique and reproducible downloadable ID for each downloadable, which cannot happen if you are separately hashing the downloadable and the components. It can only happen if you fetch the components and hash together. If there are no other questions, that's all I have for the 780 patent. I can address, I can turn to the 154 patent unless there are any further questions on this. Okay, well, just you're opening up all of these doors for Ms. Brooks' rebuttal for matters that she didn't raise, but you're free to use your time if you wish. Well, I will I will submit on the papers then, Your Honor, unless anyone on the panel has any further questions. Colleagues, thank you. We'll hear from Ms. Brooks on rebuttal. Thank you, Your Honor. I am not going to go revisit the 154 and the 780 claim construction issues. Those are de novo review. And I know this court is perfectly capable of doing a de novo review on those issues. And to be candid with the court, even if we got relief on the 154 or the 780 or the 454, and we were remanded for either a trial or even a summary judgment and Juniper was found to infringe, if the court does not deal with what the lower court did as far as the damage is concerned, we will have a wrong with no remedy. Juniper will be liable of infringement and we will not be able to recover one penny. So instead, what I'd like to do is take my remaining time and address Judge Wallach's question. Is there any merit to our damages argument? And the answer is most assuredly, yes. Counsel just now cited multiple facts about STP devices that are incapable of interfacing with SCI ATP with no record citation whatsoever. So at a minimum, we appear to have a dispute, a factual dispute about that. Now, I'll give the court very quickly the actual record citations we are relying on. Dr. Eric Cole, in his expert report, at appendix citation 10648, footnote one, specifically lists, and these are his words, SRX gateways that are capable of interfacing with SCI ATP. And then he lists only those gateways. Our damages expert at appendix 9901 then lists those specific and only those specific SRX gateways that are capable of interfacing with SCI ATP. So that takes that issue off the table. So the remaining question is, well, what does it mean to be capable? Don't you have to? And I think Counsel argued you had to download some software and modify the SRX device. According to their own documents that they cite, specifically at their red brief at pages 52 and 53, they cite appendix 24483 for that proposition. And I would quote verbatim from that document, quote, you do not need to install the SCI ATP free license as these are included in your basic software, unquote. So apparently, if you want some kind of a premier package, you might have to do something. But they're saying, Juniper is saying, you don't need to download anything. Your SCI ATP free license is included with your SRX device. Their own marketing materials say it, appendix 10439. And it says, note, colon, you do not need to download any additional software to run SCI ATP. So Juniper is telling the public that SCI ATP is included in their SRX devices. Juniper is telling internally that you do not need to install your free SCI ATP. It comes with your SRX device. And so a system claim, the law is very clear on that. The infringement occurs at the time of sale. If that device has the capability of infringing, even if it never actually does the interfacing, that is infringement. Sadly, the court misunderstood our infringement theory. It never changed. It was in Dr. Cole's expert report from the beginning. The court misunderstood it and thought we were accusing the SRX devices alone of infringement. We never did. All of those that worked in conjunction with SCI ATP. Thank you very much. Could I ask one question? I just want to know, on the damages issue, Ms. Brooks, does it relate to all the patents in suit or just to the 494 patent? It would relate to all the patents in suit, Your Honor, because all of them are systems claims. So unless the district court is told by this court that what the district court did by then we're going to go back and we're going to end up with the exclusion of our damages expert in its entirety for any of the patents. Okay, thank you. Thank you very much. Thank you. We thank both counsel and the cases submitted.